**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, DISTRICT COUNCIL 47 HEALTH AND WELFARE FUND, on behalf of itself and all others similarly situated, | Civil Action No. 17-7897 |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| vs. | |
| FERRING PHARMACEUTICALS, INC., | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff American Federation of State, County and Municipal Employees, District Council 47 Health and Welfare Fund ("Plaintiff" or "AFSCME DC 47"), on behalf of itself and all others similarly situated, through their undersigned counsel, alleges as follows upon personal knowledge as to facts pertaining to itself, and upon information and belief (based on the investigation of its counsel) as to all other matters.

## NATURE OF THE ACTION

1.     Defendant Ferring Pharmaceuticals, Inc. ("Ferring" or "Defendant") manufactures, warrants, advertises, and sells Bravelle©, the brand name version of the generic drug urofollitropin designed to treat infertility in women.  Bravelle stimulates egg maturation and multiple follicular development in women who are able to produce and release eggs.  Bravelle is commonly used in the course of assisted reproductive technology (including, without limitation, *in vitro* fertilization, known as "IVF," and intrauterine insemination, known as "IUI").

1

2.      On or about October 13, 2015, Ferring voluntarily recalled all Bravelle that it sold throughout the United States between March 2014 and October 2015 (the "Recalled Lots") after Ferring's internal quality monitoring revealed that certain lots of the drug did not meet its represented potency specifications, *i.e.*, the Bravelle that Ferring sold was sub-potent.

3.      The Recalled Lots include the following Lot numbers:

| |
|---|
| H14942A-1 |
| H14942A-2 |
| H1581SA-1 |
| H15815B-1 |
| H15815SMA-1 |
| H16998A-1 |
| H16998SMA-1 |
| K10008A-1 |
| Kl0008A-2 |
| Kl1813A-1 |
| K11813A-2 |
| K11813B-1 |
| K11813C-1 |
| K13031A-1 |
| K13031B-1 |
| K13031B-2 |
| K13503SMA-1 |
| K13503A-1 |
| K13503B-1 |
| Kl3512A-1 |
| K13512A-2 |
| K13921A-1 |
| K13921A-2 |
| K13921B-1 |
| K14616A-1 |
| K14616A-2 |
| K15917A-1 |
| K15917SMA-1 |
| K15917SMA-2 |
| K17006AA |
| K18201AA |
| K18202AA |
| L10403AA |
| Ll0403AB |

| L10840AA |
| L10992AA |

4.     Specifically, Ferring's stability testing showed a decreased potency in follicle stimulating hormone ("FSH")—a hormone naturally secreted by the anterior pituitary gland that regulates the development, growth, pubertal maturation and reproductive processes of the body and is one of the primary ingredients in Bravelle—resulting in a decreased therapeutic effect and creating the potential for unnecessary over-exposure of patients in establishing an effective dose and, consequently, an increased manifestation of associated side effects.

5.     Plaintiff brings this action on behalf of itself and all other medical benefit plans, insurance providers and third party payers, including self-funded plans, in the United States who purchased, reimbursed and/or paid for all or part of the purchase price of Bravelle contained in the Recalled Lots.  Before manufacturing, warranting, advertising, and/or selling the Recalled Lots of Bravelle, Ferring failed to take appropriate steps to ensure that the Recalled Lots met Ferring's representations regarding Bravelle's potency.  Ferring knew or should have known that the Recalled Lots were not suitable and suffered from decreased potency, which could substantially affect their efficacy in the treatment of infertility.

6.     Plaintiff and the Class members, as defined below, were injured by paying for Bravelle in the Recalled Lots, and seek relief for their economic damages caused by the Recalled Lots' failure to meet Ferring's represented potency specifications.  Plaintiff seeks relief to remedy Ferring's breach of express warranty; breach of implied warranty; unjust enrichment; violation of the various consumer fraud statutes discussed below; and violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq*. ("MMWA").

## THE PARTIES

7.     Plaintiff American Federation of State, County and Municipal Employees,

District Council 47 Health and Welfare Fund, is a health and welfare trust fund providing medical benefits, including prescription drug coverage, to participants and their dependents, representing active or retired employees of the City of Philadelphia, with offices in Philadelphia, Pennsylvania.  AFSCME DC 47 is a "governmental plan" as that term is defined in Section 3(32) of the Employee Retirement Income Security Act of 1974, as amended by 29 U.S.C. 1002(32). At all times relevant hereto, AFSCME DC 47 was obligated to pay for covered prescription drugs for persons qualified for medical benefits furnished by or through AFSCME DC 47 in connection with treatments covered under its policies.   AFSCME DC 47 has incurred approximately $11,261.84 in costs for recalled Bravelle.  Plaintiff was damaged as a direct and proximate result of its payments for Bravelle contained in the Recalled Lots.

8.     Had Plaintiff known, prior to paying for all or part of the purchase price of Bravelle, that Bravelle suffered from sub-potency issues, or even that it had the potential to suffer from sub-potency issues, Plaintiff would not have covered Bravelle under its policies.

9.     Ferring is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 100 Interpace Parkway, Parsippany, New Jersey 07054.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds $5 million, exclusive of interest and costs, and is a class action in which Plaintiff and some members of the Class are citizens of states different than Defendant. *See* 28 U.S.C. § 1332(d)(2)(A).

11.     This Court has personal jurisdiction over Ferring because Ferring's principal

place of business is in this District.

12.     Venue properly lies in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the acts giving rise to Plaintiff's claims occurred in this District and because Ferring is subject to personal jurisdiction within this District.

## FACTUAL ALLEGATIONS

13.     Ferring is part of a multinational pharmaceutical company with annual revenues exceeding $1 billion.

14.     Ferring describes itself as "a research-driven biopharmaceutical company devoted to commercialization of innovative products in the fields of infertility and reproductive health, gastroenterology, gynecology, orthopedics and urology."

15.     In May 2002, the U.S. Food and Drug Administration ("FDA") approved Bravelle for the treatment of infertility.

16.     Medications like Bravelle are a regular and normal part of infertility treatments (including IVF and IUI procedures).  These medications are used to prepare the body for treatment and to increase the probability that more healthy eggs are released from the ovaries.

17.     Under normal circumstances, ovulation occurs once a month when a ripened egg which is ready to be fertilized is released from the ovaries.  For a woman trying to conceive, regular ovulation is incredibly important as this is when a woman is most fertile.  If a woman is not ovulating properly, fertility drugs can be prescribed to boost the natural system and ultimately increase the chances of successful conception.

18.     Bravelle is a highly-purified human FSH, one of the most important hormones for inducing the growth of the follicles that produce ova (eggs).  FSH is key when it comes to fertility, as it allows a small group of follicles to grow and develop inside the ovary.  Each of

these follicles contains an egg, so by increasing the body's levels of FSH, the chance of the ovaries releasing a ripe egg for fertilization is increased. The concentration of FSH is critical for the onset and duration of follicular development, and consequently for the timing and number of follicles reaching maturity.

19.    Because FSH is the main hormone involved in ovulation induction, FSH treatments result in the development of multiple follicles and increase the quantity of mature egg production in women seeking to become pregnant, making the eggs more likely to be fertilized and increasing the chances of successful conception.

20.    As a human FSH, Bravelle is classified as a urofollitropin: injectable hormones that control the reproductive function. Bravelle is administered via either subcutaneous or intramuscular injection. A picture of Bravelle as sold in the United States is below, and it is important to note that the box itself contains certain material affirmative representations, including that it contains a potency of 75 IU (international units of potency).



21.    Because the primary benefits of Bravelle include the development of multiple follicles and stimulation of ovulation and the production of multiple ova via the administration of

FSH, it is critical that patients being treated with Bravelle receive appropriate and adequate concentrations of doses of FSH in order to achieve the intended and specified effects.  It is likewise critical that patients being treated with Bravelle receive Bravelle that meets the represented potency specifications, *i.e.*, is not defective.

22.    In fact, recalled Bravelle did not contain a potency of 75 IU.  Had Plaintiff known, prior to paying for all or part of the purchase price of Bravelle, that Bravelle suffered from sub-potency issues, or even that it had the potential to suffer from sub-potency issues, Plaintiff would not have covered Bravelle under its policies.

23.    Further, had Ferring disclosed to Plaintiff, the Class, physicians, pharmacies or the public at large that the Recalled Lots were sub-potent and/or had the potential to suffer from sub-potency issues, Plaintiff and the Class would not have paid for the drug or covered the drug under their policies.

24.    Ferring received numerous complaints from doctors and patients concerning Bravelle and was informed by consumers and physicians that Bravelle was not performing as expected.  In response, Ferring did not warn third party payers, including Plaintiff, or take appropriate steps to evaluate and remedy the problem.  Thus, prior to the recall, Ferring should have been on heightened notice of potential stability and potency issues with Bravelle.

25.    In 2015, Ferring's internal stability testing began to reveal that certain batches of Bravelle manufactured by Ferring were sub-potent, meaning that they suffered from decreased FSH potency (resulting in a decreased therapeutic effect and, accordingly, unnecessary over-exposure of patients in establishing an effective dose).  Consequently, Ferring initiated a series of voluntary recalls of Bravelle in multiple markets including the United States and Canada, and ultimately, world-wide.  In fact, given the serious sub-potency issues with Bravelle, Ferring

eventually withdrew Bravelle from the world-wide market.

26.    Ferring recalled unsold batches of Bravelle directly from pharmacies and sought to recall drugs already sold by sending letters directly to consumers.  Subject to the recall were all lots of Bravelle sold in the United States between March 2014 and October 2015.  The Bravelle paid for by Plaintiff was included in the Recalled Lots.

27.    Shortly after the recall, in October 2015, individual consumers received letters from Ferring informing them of the reduced potency issue and recall, stating that "[i]f you purchased BRAVELLE in the U.S. between <u>March 27, 2014 and October 15, 2015</u> you may be eligible for reimbursement of your out-of-pocket costs for BRAVELLE."  *See* Letter attached hereto as **Exhibit 1** (emphasis in original).

28.    Thus, individual consumers who purchased Bravelle were able to contact Ferring and obtain a reimbursement for the price of the Bravelle that they purchased once Ferring determined that the Bravelle purchased was from one of the Recalled Lots.  Ferring, however, did not offer third party payers, such as Plaintiff AFSCME DC 47 and similarly situated third party payers, reimbursement of the amounts they paid for recalled Bravelle

29.    While Ferring claimed that only seven (7) of the Recalled Lots exhibited sub-potency pursuant to its own internal testing, it nevertheless recalled *thirty-two* (32) Recalled Lots of Bravelle.  Voluntarily incurring the costs of recalling the 32 lots suggests a very strong inference that Ferring knew or suspected that all of the 32 lots were sub-potent or had the potential to be sub-potent.  This inference is made even stronger by Ferring's subsequent permanent withdrawal of Bravelle from the worldwide market.

30.    Upon information and belief, all of the Recalled Lots were sub-potent or had the potential to be sub-potent and Ferring knew or should have known this.  The Recalled Lots

should not have been sold and used by women who were paying huge sums of money for medical treatments so that they could attempt to become pregnant.

31.     As set forth above, Plaintiff paid for all or part of the purchase price of recalled Bravelle and relied on Ferring's potency representations when choosing to cover Bravelle under its policies, and was damaged thereby.

## CLASS ALLEGATIONS

32.     Plaintiff brings Counts I, II, III, IV and VI below, individually and as a class action, pursuant to FED. R. CIV. P. 23(a), 23(b)(2) and/or 23(b)(3), on behalf of a nationwide class of third party payers who purchased Bravelle contained in the Recalled Lots, as defined below:

> All medical benefit plans, insurance providers and other third party payers, including self-funded plans, in the United States who purchased, reimbursed and/or paid for all or part of the purchase price of Bravelle contained in the Recalled Lots (the "Nationwide Class"). Excluded from the Nationwide Class are: (1) Defendant, and any entity in which Defendant has a controlling interest or which has a controlling interest in Defendant; (2) Defendant's legal representatives, assigns and successors; and (3) the judge(s) to whom this case is assigned and any member of the judge's immediate family.

33.     Alternatively, or in addition to the Nationwide Class claims, Plaintiff brings Counts I, II, III, V, and VI under FED. R. CIV. P. 23(a), 23(b)(2) and/or 23(b)(3) on behalf of itself and all similarly situated entities operating in Pennsylvania and other states where the laws are materially similar to those of Pennsylvania (the "Multistate TPP Class"). The Multistate TPP Class consists of:

> All medical benefit plans, insurance providers and other third party payers, including self-funded plans in Illinois, California, Colorado, Florida, Massachusetts, Michigan, Minnesota, Missouri, Nebraska, New Jersey, New York, Ohio, Pennsylvania and Washington who purchased, reimbursed and/or paid for all or part of the purchase price of Bravelle contained in the Recalled Lots. Excluded from the Multistate Class are: (1) Defendant, and any entity in which Defendant has a controlling interest or which has a controlling interest in

Defendant; (2) Defendant's legal representatives, assigns and successors; and (3) the judge(s) to whom this case is assigned and any member of the judge's immediate family.

34.     Alternatively, or in addition to the Nationwide Class and Multistate Class claims, Plaintiff brings Counts I, II, III, V, and VI under Fed. R. Civ. P. 23(a), 23(b)(2) and/or 23(b)(3) on behalf of itself and all similarly situated entities operating in Pennsylvania (the "Pennsylvania Class").  The Pennsylvania Class consists of:

> All medical benefit plans, insurance providers and other third party payers, including self-funded plans operating in Pennsylvania who purchased, reimbursed and/or paid for all or part of the purchase price of Bravelle contained in the Recalled Lots.  Excluded from the Pennsylvania Class are: (1) Defendant, and any entity in which Defendant has a controlling interest or which has a controlling interest in Defendant; (2) Defendant's legal representatives, assigns and successors; and (3) the judge(s) to whom this case is assigned and any member of the judge's immediate family.

35.     The Nationwide Class, Multistate Class, and Pennsylvania Class are collectively referred to below as the "Classes."

36.     Plaintiff reserves the right to redefine the Classes prior to class certification.

37.     The rights of each member of the Classes were violated in a similar fashion based upon Ferring's uniform actions.

38.     This action has been brought and may be properly maintained as a class action for the following reasons:

a.      <u>Numerosity</u>:    Members of the Classes are so numerous that their individual joinder is impracticable.  Plaintiff is informed and believes that the proposed Classes contain hundreds of entities that paid for all or part of the purchase price of Bravelle contained in the Recalled Lots.   The Classes are therefore sufficiently numerous to make joinder impracticable, if not impossible.  The precise number of Class members is unknown to Plaintiff at this time.

           b.     <u>Existence and Predominance of Commons Questions of Fact and Law</u>: Common questions of law and fact exist as to all members of the Classes. These questions predominate over any questions affecting individual Class members. These common legal and factual questions include, but are not limited to, the following:

        i.     Whether the Bravelle contained in the Recalled Lots met the potency specifications warranted and claimed by Ferring;

        ii.     Whether the Recalled Lots were merchantable goods at the time of sale;

        iii.     Whether the Recalled Lots were fit for their intended purpose;

        iv.     Whether Defendant made fraudulent, false, deceptive, and/or misleading statements in connection with the sale of the Recalled Lots;

        v.     Whether Defendant omitted material information when it sold the Recalled Lots and the date on which Defendant knew or should have known of the sub-potency issues with the Recalled Lots;

        vi.     Whether Defendant's recall notice was timely and/or sufficient;

        vii.     Whether Defendant breached the terms of its express warranty.

        viii.     The appropriate nature of class-wide equitable relief, and;

        ix.     The appropriate measurement of restitution and/or measure of damages to award to Plaintiff and members of the Classes.

These and other questions of law or fact which are common to the members of the Classes predominate over any questions affecting only individual members of the Classes.

           c.     <u>Typicality</u>: Plaintiff's claims are typical of the claims of the Classes since

Plaintiff and all members of the Classes paid for all or part of the purchase price of Bravelle contained in the Recalled Lots. Furthermore, Plaintiff and all members of the Classes sustained monetary and economic injuries arising out of Defendant' wrongful conduct by, *inter alia,* paying for all or part of the purchase price of Bravelle contained in the Recalled Lots notwithstanding the decreased potency. Had this material information been disclosed to Plaintiff and the Class members, they would not have paid for all or part of the purchase price of Bravelle contained in the Recalled Lots. Plaintiff is advancing the same claims and legal theories on behalf of themselves and all absent Class members.

d.      <u>Adequacy</u>:  Plaintiff is an adequate representative of the Classes because its interests do not conflict with the interests of the Classes that it seek to represent; it has retained counsel competent and highly experienced in complex class action litigation and it intends to prosecute this action vigorously. The interests of the Classes will be fairly and adequately protected by Plaintiff and its counsel.

e.      <u>Superiority</u>:  A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiff and members of the Classes. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for members of the Classes to individually and effectively redress the wrongs done to them. Even if the members of the Classes could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation also increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management

difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court.

f.   <u>Ascertainability</u>: Class members are readily ascertainable, and can be identified by Defendant's records.

## CAUSES OF ACTION

### COUNT I
### BREACH OF EXPRESS WARRANTY
**(On Behalf of the Nationwide Class, the Multistate Class, and the Pennsylvania Class)**

39.   Plaintiff and the Classes incorporate by reference paragraphs 1-38 as though fully set forth herein.

40.   Plaintiff brings this cause of action on behalf of itself and on behalf of the members of the Classes against Defendant.

41.   Defendant's Recalled Lots are goods and thus Plaintiff's and the Classes' breach of express warranty claim is governed by the Uniform Commercial Code.

42.   Bravelle was sold to consumers by pharmacies, who acted as agents, dealers and/or representatives of Ferring.  Nevertheless, Ferring was aware that third party payers, like Plaintiff, were a necessary factor in Ferring's ability to sell Bravelle in the U.S. market—and a large source of Ferring's revenue—because a substantial percentage of Ferring's Bravelle sales were dependent on third party payers covering Bravelle under their policies.

43.   Defendant dealt directly with Plaintiff and members of the Classes who were Defendant's known purchasers (third-party beneficiaries) to whom Ferring marketed and gave warranties.

44.   Every package of Bravelle in Defendant's Recalled Lots contained an express warranty with every purchase.  In addition to the written warranties contained on the outside of

the packaging of Bravelle as set forth above with respect to potency, each package of Bravelle comes with a Patient Information form (attached hereto as **Exhibit 2**). Ferring warranted in the Patient Information Form that the Recalled Lots contained FSH in sufficient amount and with sufficient potency to treat women who need help developing and releasing eggs as well as those with healthy ovaries to make multiple eggs as part of fertility treatments.

45. Moreover, the Prescribing Information for Bravelle warrants that the medication "contain[s] 82.5 International Units of FSH, to deliver 75 International Units FSH after reconstituting."

46. Such warranties became part of the basis of the transaction between Plaintiff and the Classes and Defendant and Plaintiff relied on these warranties when covering Bravelle under their policies and, consequently, when purchasing Bravelle.

47. Defendant extended express, written warranties regarding the potency of the Bravelle contained in the Recalled Lots directly to Plaintiff and members of the Classes and these express warranties created a relationship between Defendant and Plaintiff.

48. Defendant also knew the identity, purpose and requirements of its customers and manufactured or delivered the goods specifically to meet those requirements. Defendant knew that a specific class of individuals (*i.e.,* women who need help developing and releasing eggs as well as those with healthy ovaries to make multiple eggs as part of fertility treatments), would use the Recalled Lots, and that third party payers, including Plaintiff, would make decisions to cover Bravelle under their policies and pay for all or part of the purchase price of Bravelle for this specific class of individuals.

49. Defendant also knew that this specific class of individuals required a drug that contained FSH in sufficient amount and with sufficient potency. Defendant delivered the

Recalled Lots to meet those requirements in sealed containers, intended for human use, and these goods did not conform to Defendant's promises, affirmations, or representations at the time they left Defendant's control.

50.     By virtue of the Reimbursement Program, Ferring voluntarily assumed direct responsibility for its warranties concerning Bravelle's potency.  Ferring should be judicially estopped from arguing that it bears no direct relationship or responsibility for those warranties.

51.     Defendant breached its express warranties because the Recalled Lots were not as promised and did not conform its promises, affirmations, or representations.

52.     As a result of Defendant's breach, Plaintiff and the Classes have suffered damages including, but not limited to, the amounts spent to pay for all or part of the purchase price Bravelle for use in fertility treatments.

53.     Defendant has long had knowledge of the potency issues with Recalled Bravelle. In fact, Defendant initiated a voluntary recall of the Bravelle.  Defendant also has had the opportunity to cure its breach of express warranty, as evidenced by the Reimbursement Program it initiated to reimburse individual users for the cost of the drug.  And, Defendant has been notified by numerous consumers that its Reimbursement Program failed to remedy all economic injuries caused by Defendant's breach of express warranty.  Accordingly, Ferring has been notified of its breach of express warranty.

## COUNT II
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (On Behalf of the Nationwide Class, the Multistate Class, and the Pennsylvania Class)

54.     Plaintiff and the Classes incorporate by reference paragraphs 1-38 as though fully set forth herein.

55.     Plaintiff brings this cause of action on behalf of itself and on behalf of the

members of the Classes against Defendant.

56.     At all times mentioned herein, Defendant manufactured and/or supplied the Recalled Lots and, prior to the time Plaintiff and the Classes decided to cover Bravelle under their policies and pay for all or part of the purchase price of Bravelle, Defendant impliedly warranted to Plaintiff that the Recalled Lots were of merchantable quality and fit for the use for which they were intended.

57.     Defendant dealt directly with Plaintiff, including by issuing the Patient Information form with each package of Bravelle.

58.     Plaintiff was a direct and primary beneficiary of Defendant's implied warranties made with respect to the Recalled Lots.  Defendant knew that a specific class of individuals (*i.e.* women who need help developing and releasing eggs as well as those with healthy ovaries to make multiple eggs as part of fertility treatments), would use the Recalled Lots and that third party payers, including Plaintiff, would decide to cover Bravelle under their policies and pay for all or part of the purchase price of Bravelle for this specific class of individuals.

59.     Defendant also knew that this specific class of individuals required a drug that contained FSH in sufficient amount and with sufficient potency.  Defendant delivered the Recalled Lots to meet those requirements.  The Recalled Lots were sold in sealed containers, intended for human use, and were defective and not or merchantable quality at the time they left Defendant's control.

60.     By virtue of the Reimbursement Program, Ferring voluntarily assumed direct responsibility for its warranties concerning Bravelle's potency.  Ferring should be judicially estopped from arguing that it bears no direct relationship or responsibility for those warranties

61.     Plaintiff relied on the skill and judgment of Defendant in deciding to cover

Bravelle under their policies and in paying for all or part of the purchase price of Bravelle the Recalled Lots.

62.    The Recalled Lots were unfit for their intended use and were not of merchantable quality, as warranted by Defendant, because they did meet the product specifications regarding FSH potency.  As a result, the Recalled Lots fail to perform when put to their intended use.

63.    Defendant breached the implied warranty of merchantability as the Recalled Lots were not of a merchantable quality at the time of sale.

64.    As a direct and proximate result of the breach of said warranties, Plaintiff and the putative Classes suffered and will continue to suffer losses and damages as alleged herein in an amount to be determined at trial.

65.    Defendant has long had knowledge of the potency issues with Recalled Bravelle. In fact, Defendant initiated a voluntary recall of the Bravelle.  Defendant also has had the opportunity to cure its breach of implied warranty, as evidenced by the Reimbursement Program it initiated to reimburse individual users for the cost of the drug.  And, Defendant has been notified by numerous consumers that its Reimbursement Program failed to remedy all economic injuries caused by Defendant's breach of implied warranty.  Accordingly, Ferring has been notified of its breach of implied warranty.

66.    Plaintiff and Classes members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of the Nationwide Class, the Multistate Class, and the Pennsylvania Class)**

67.    Plaintiff and the Classes incorporate by reference paragraphs 1-38 as though fully

set forth herein.

68.     Plaintiff brings this claim in the alternative to its claims for breach of express and implied warranties and for violation of state consumer protection statutes.

69.     Plaintiff and Class members conferred a tangible economic benefit upon Defendant by paying for all or part of the purchase price of Bravelle in the Recalled Lots. Plaintiff and Class members would not have paid for all or part of the purchase price of Bravelle the Recalled Lots had they known that those Recalled Lots would not perform as warranted, nor would they have decided to cover all or part of the cost of Bravelle under their policies.

70.     Failing to require Defendant to provide remuneration under these circumstances would result in Defendant being unjustly enriched at the expense of Plaintiff and the Class members.

71.     Defendant's retention of the benefit conferred upon them by Plaintiff and members of the Classes would be unjust and inequitable.

**COUNT IV**
**VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT ("NJCFA"),**
**N.J. STAT. ANN. § 56:8-1, et. seq.**
**(On Behalf of the Nationwide Class)**

72.     Plaintiff and the Classes incorporate by reference paragraphs 1-38 as though fully set forth herein.

73.     Plaintiff, other members of the Class, and Defendant are "persons" within the meaning of the NJCFA.

74.     Plaintiff and other members of the Class are "consumers" within the meaning of the NJCFA.

75.     At all relevant times material hereto, Defendant conducted trade and commerce in New Jersey within the meaning of the NJCFA.

76.     Defendant has engaged in engaged in unconscionable and deceptive acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts with respect to the sale of Bravelle in violation of the NJCFA, including but not limited to, defective design and manufacture of Bravelle as well as misleading marketing, advertising, selling, and warranting of Bravelle.  Defendant failed to disclose material information about the potency of Bravelle, including after those potency problems became apparent to Defendant and while Defendant had a duty to disclose such information.  Defendant has also failed or refused to pay for necessary and complete expenses incurred due to the sub-potent Bravelle it manufactured and marketed.

77.     Among other things, Defendant made numerous deceptive statements regarding Bravelle, including, but not limited to, that the Recalled Lots contained FSH in sufficient amount and with sufficient potency to treat women who need help developing follicles and releasing eggs as well as those with healthy ovaries to ultimately release multiple eggs as part of fertility treatments, and that Bravelle "contain[s] 82.5 International Units of FSH, to deliver 75 International Units FSH after reconstituting."  As described above, quality monitoring revealed reduced FSH potency in the Recalled Lots.

78.     Defendant intended that Plaintiff and the other members of the Class rely on the acts of concealment and omissions, so that Plaintiff and other Class members would pay for all or part of the purchase price of Bravelle.

79.     Defendant's practices, acts, policies, and course of conduct, as described herein, were intended to induce, and did induce Plaintiff and Class members to pay for all or part of the purchase price of Bravelle.

80.    Had Defendant disclosed all material information regarding Bravelle to Plaintiff and other members of the Class, they would not have paid for all or part of the purchase price of Bravelle.

81.    The foregoing acts, misrepresentations, omissions and unconscionable commercial practices caused Plaintiff and other members of the Class to suffer an ascertainable loss in the form of, *inter alia*, monies spent to pay for all or part of the purchase price of Bravelle and they are entitled to recover such damages, together with appropriate penalties, including treble damages, attorneys' fees and costs of suit.

82.    The State of New Jersey's state interest in applying its own law to the claims of all Class members located throughout the country, regardless of their state of residence, outweighs that of other states, thereby making application of New Jersey law to the entire Class appropriate, because, *inter alia*:

    a.  Defendant's principal place of business is located in New Jersey

    b.  Defendant controlled and directed its nationwide sales operations and support operations from New Jersey;

    c.  Defendant's marketing operations and decisions, including the decisions as to how to advertise, promote and sell Bravelle, were made in New Jersey; and

    d.  Defendant directed its testing of and quality assurance for Bravelle in New Jersey.

## COUNT V
### VIOLATION OF STATE CONSUMER PROTECTION STATUTES
**(On Behalf of the Nationwide Class, the Multistate Class, and the Pennsylvania Class)**

83.    Plaintiff and the Classes incorporate by reference paragraphs 1-38 as though fully set forth herein.

84. Defendant markets and sells Bravelle to consumers throughout the United States, including to Plaintiff and the Classes. Defendant's acts and omissions regarding Bravelle affect trade and commerce across all fifty (50) states and the District of Columbia.

85. Plaintiff and Class members are consumers who paid for all or part of the purchase price of Bravelle which was used primarily for personal, family and/or household purposes.

86. Defendant has engaged in unfair methods of competition and unfair, deceptive, fraudulent, unconscionable and/or unlawful acts or practices, including without limitation, by defective design and manufacture of Bravelle as well as misleading marketing, advertising, selling, and warranting of Bravelle. Defendant failed to disclose material information about the potency of Bravelle, including after those potency problems became apparent to Defendant and while Defendant had a duty to disclose such information. Defendant has also failed or refused to pay for necessary and complete expenses incurred due to the sub-potent Bravelle it manufactured and marketed.

87. Among other things, Defendant made numerous deceptive statements regarding Bravelle, including, but not limited to, that the Recalled Lots contained FSH in sufficient amount and with sufficient potency to treat women who need help developing follicles and releasing eggs as well as those with healthy ovaries to ultimately release multiple eggs as part of fertility treatments, and that Bravelle "contain[s] 82.5 International Units of FSH, to deliver 75 International Units FSH after reconstituting." As described above, quality monitoring revealed reduced FSH potency in the Recalled Lots.

88. Through its conduct of suppressing material information while making affirmative material misstatements concerning Bravelle's potency, Defendant has violated the

following state consumer laws prohibiting unfair methods of competition and unfair, deceptive, unconscionable, fraudulent and/or unlawful acts or practices:

a.    The California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code, § 17200, *et seq.*   In particular, Defendant violated UCL by engaging in unfair, unlawful and fraudulent marketing and selling of a product it knew to be defective.

b.    The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.204(1), *et seq.*;

c.    The Georgia Fair Business Practices Act, O.C.G.A. Sections 10-1-390 *et seq.*;

d.    The Idaho Consumer Protection Act, Idaho Code §§ 48-603(5), (7), (17) and (18), *et seq.*, and Idaho Code § 48-603C, *et seq.*;

e.    The Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 Ill. Stat. § 505/2, *et seq.*, and the Illinois Uniform Deceptive Trades Practices Act, 815 Ill. Stat. § 510/2(a)(5), (7) and (12), *et seq.*;

f.    The Maine Uniform Deceptive Trade Practices Act, 10 M.R.S.A. §§ 1212(1)(E) and (G), *et seq.*, and the Maine Unfair Trade Practices Act, 5 M.R.S.A. § 207, *et seq.*;

g.    The Massachusetts Consumer Protection Act, Ma. Gen. Laws Ann. Ch. 93A § 2(a), *et seq.*;

h.    The Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.44, subd. 1(5), (7) and (13), *et seq.*, the Minnesota Consumer Fraud Act, Minn. Stat. § 325F.69, subd. 1, and Minn. Stat.§ 8.31, subd. 3(a), *et*

*seq.*;

  i.  The Missouri Merchandising Practices Act, Mo. Ann. Stat. § 407.020(1), *et seq.*;

  j.  The New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-2, *et seq.*;

  k.  New York Business Law, N.Y. Gen. Bus. Law §§ 349(a), 350 *et seq.*;

  l.  The Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat.§ 201-1 *et seq.*;

  m.  The South Dakota Deceptive Trade Practices Act and Consumer Protection Act, S.D. Codified Laws § 37-24-6(1), *et seq.*;

  n.  The Texas Deceptive Trade Practices- Consumer Protection Act, V.T.C.A., Bus. & C. § 17.46(a), (b)(5) and (7), *et seq.*;

  o.  The Virginia Consumer Protection Act, Va. Code Ann. § 59.1-200(A)(5)(6) and (14), *et seq.*; and

  p.  The Washington Consumer Protection Act, Wash. Rev. Code § 19.86.020, *et seq.*

89. Plaintiff relied on Ferring's potency representations when choosing to cover Bravelle under its policies and would not have covered Bravelle under its policies had Ferring disclosed material information concerning potential stability and potency issues with Bravelle.

90. As a direct and proximate result of Defendant's unfair methods of competition and unfair, deceptive, fraudulent, unconscionable and/or unlawful acts or practices, Plaintiff and the Classes have suffered ascertainable losses and injuries including, without limitation, the out-of-pocket expenditures to pay for all or part of the purchase price of the drug.

91. Plaintiff brings this action on behalf of themselves and all similarly situated

persons for the relief requested and to promote the public interests in the provision of truthful, non-deceptive information to allow consumers to make informed purchasing decisions and to protect Plaintiff, the Classes, and the public from Defendant's unfair methods of competition and unfair, deceptive, fraudulent, unconscionable and/or unlawful practices. Defendant's wrongful conduct has had widespread impact on the public at large, as demonstrated by the thousands of complaints about its product.

92.     Defendant has long had notice of Plaintiff'' allegations, claims and demands, including from internal audits, testing, and complaints regarding Bravelle.

### COUNT VI
### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
**(On Behalf of the Nationwide Class, the Multistate Class, and the Pennsylvania Class)**

93.     Plaintiff and the Classes incorporate by reference paragraphs 1-38 as though fully set forth herein.

94.     Bravelle is a consumer product as defined in 15 U.S.C. § 2301(1).

95.     Plaintiff and the Class members are consumers as defined in 15 U.S.C. § 2301(3).

96.     Ferring is a supplier and warrantor as defined in 15 U.S.C. § 2301(4) and (5).

97.     In connection with the sale of Bravelle, Ferring issued written warranties as defined in 15 U.S.C. § 2301(6) by making the express representations and warranties described herein.

98.     The Recalled Lots do not conform to the express warranties regarding Bravelle's potency because each of the express warranties is false and misleading.

99.     By reason of Ferring's breach of warranties, Ferring violated the statutory rights due to Plaintiff and the Class members pursuant to the MMWA, thereby damaging Plaintiff and

the Class members.

100.    Affording Ferring any further opportunity to cure its breach of written warranties would be unnecessary and futile here. At the time Ferring sold the Recalled Lots, Ferring should have known, or was reckless in not knowing, of its misrepresentations concerning the potency of the Bravelle contained in the Recalled Lots but nonetheless failed to rectify the situation and/or disclose the defect.  Under these circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirements that Plaintiff resort to an informal dispute resolution procedure and/or afford Ferring any further opportunity to cure its breach of warranties are excused and thereby deemed satisfied.

101.    Plaintiff and the Class members were injured as a direct and proximate result of Ferring's breach because they would not have covered Bravelle under their policies or paid for all or part of the purchase price of Bravelle from the Recalled Lots if the true facts had been known.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests, on behalf of itself and members of the Classes, that this Court:

A.    determine that the claims alleged herein may be maintained as a class action under Rule 23(a), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure, and issue an order certifying the Class (and/or proposed Classes) as defined above and designating Plaintiff's counsel as counsel for the Class;

B.    award all actual, general, special, incidental, statutory, treble or other multiple, punitive and consequential damages to which Plaintiff and Class members are entitled;

C.    award pre-judgment and post-judgment interest on such monetary relief;

D.    award reasonable attorneys' fees and costs; and

E.    grant such further and other relief that this Court deems appropriate.

**JURY DEMAND**

Plaintiff, on behalf of themselves and the Classes, demand a trial by jury on all issues so triable.

Dated: October 4, 2017                   By:    */s/ Katrina Carroll*
                                                Katrina Carroll
                                                *kcarroll@litedepalma.com*
                                                Kyle A. Shamberg
                                                *kshamberg@litedepalma.com*
                                                Ismael T. Salam
                                                *isalam@litedepalma.com*
                                                **LITE DEPALMA GREENBERG, LLC**
                                                211 W. Wacker Drive
                                                Suite 500
                                                Chicago, Illinois 60606
                                                Phone: 312.750.1265
                                                Fax: 312.212.5919

                                                Shanon J. Carson
                                                *scarson@bm.net*
                                                Jeffrey L. Osterwise
                                                *josterwise@bm.net*
                                                **BERGER & MONTAGUE, P.C.**
                                                1622 Locust Street
                                                Philadelphia, PA  19103
                                                Telephone: (215) 875-3000
                                                Fax: (215) 875-4604

                                                Charles E. Schaffer
                                                *cschaffer@lfsblaw.com*
                                                **LEVIN, SEDRAN & BERMAN**
                                                510 Walnut Street, Suite 500
                                                Philadelphia, PA 19106
                                                Telephone: (215) 592-1500
                                                Fax: (215) 592-4663

                                                ***Counsel for Plaintiff and the Class***

26

# EXHIBIT 1



Dear Valued Patient,

During routine quality monitoring, Ferring Pharmaceuticals Inc. recently determined that certain lots of BRAVELLE® (urofollitropin for injection, purified) did not meet potency requirements through the expiration date. To ensure that all of its products adhere to the highest quality standards, Ferring decided to voluntarily remove all remaining lots of BRAVELLE from the U.S. market.

To further demonstrate its commitment to the patients who use its products, Ferring has established a reimbursement program for patients who purchased the affected BRAVELLE in the U.S. If you purchased BRAVELLE in the U.S. between March 27, 2014 and October 15, 2015 you may be eligible for reimbursement of your out-of-pocket costs for BRAVELLE. To determine if you are eligible for reimbursement, please contact us at 1-877-650-3482 Monday through Friday between the hours of 8AM – 5PM EST.

Representatives will be able to provide you with additional information regarding the reimbursement program and answer questions related to the BRAVELLE recall.

We thank you for your patience during this time.

Sincerely,

Ferring Pharmaceuticals

BR/2016/2015/US(1) 10/15                                      6023_01_01AS_V2.1

# EXHIBIT 2

## Patient Information

### BRAVELLE® (brä-vel)
(urofollitropin for injection, purified)
for subcutaneous use

Read this Patient Information before you start using BRAVELLE® and each time you get a refill. There may be new information. This information does not take the place of talking to your healthcare provider about your medical condition or your treatment.

**What is BRAVELLE®?**

BRAVELLE® is a prescription medicine that contains follicle stimulating hormone (FSH). BRAVELLE® is used to treat women:

- who need help developing and releasing eggs (ovulating) and have already received a medicine to control their pituitary gland
- with healthy ovaries so they can make multiple (more than 1) eggs as part of an Assisted Reproductive Technology (ART) Cycle

**Who should not use BRAVELLE®?**

**Do not use BRAVELLE® if you:**

- are allergic to urofollitropin or any of the ingredients in BRAVELLE®. See the end of this leaflet for a complete list of ingredients in BRAVELLE®.
- have ovaries that no longer make eggs (primary ovarian failure)
- are pregnant or think you may be pregnant. If BRAVELLE® is taken while you are pregnant, it may harm your baby,
- have problems with your thyroid gland or adrenal gland or pituitary gland that are not controlled by taking medicine
- have a tumor in your female organs, including your ovaries, breast, or uterus that may get worse with high levels of estrogen
- have a tumor of your pituitary gland or hypothalamus
- have abnormal bleeding from your uterus or vagina and the cause is not known
- have ovarian cysts or enlarged ovaries, not due to a problem called polycystic ovary syndrome (PCOS)

**What should I tell my healthcare provider before using BRAVELLE®?**

**Before using BRAVELLE®, tell your healthcare provider if you:**

- have been told by a healthcare provider that you are at an increased risk for blood clots (thrombosis)
- have ever had a blood clot (thrombosis), or anyone in your family has ever had a blood clot
- had stomach (abdominal) surgery
- had twisting of your ovary (ovarian torsion)
- had or have a cyst in your ovary
- have any other medical conditions
- are breast feeding or plan to breast feed. It is not known if BRAVELLE® passes into your breast milk. You and your healthcare provider should decide if you will use BRAVELLE® or breastfeed. You should not do both.

**Tell your healthcare provider all the medicines you take**, including prescription and over-the-counter medicines, vitamins, and herbal supplements.

Know the medicines you take. Keep a list of them to show your healthcare provider and pharmacist when you get a new medicine.

**How should I use BRAVELLE®?**

- Read the **Instructions for Use** at the end of this Patient Information about the right way to use BRAVELLE® or BRAVELLE® mixed with MENOPUR®.
- Use BRAVELLE® exactly as your healthcare provider tells you to use it.
- Your healthcare provider will tell you how much BRAVELLE® to use and when to use it.
- Your healthcare provider may change your dose of BRAVELLE® if needed.
- If you miss a dose of BRAVELLE®, call your healthcare provider right away. **Do not** double the amount of BRAVELLE® you are taking.
- You may need more than 1 vial of BRAVELLE® for your dose.
- BRAVELLE® may be given under your skin (subcutaneously) or into your muscle (intramuscularly). Your healthcare provider will tell you where and how to give your BRAVELLE®.
- Your healthcare provider will give you BRAVELLE® intramuscularly.
- BRAVELLE® may be mixed with MENOPUR® in the same syringe when you give it subcutaneously.

**What are possible side effects of BRAVELLE®?**

**BRAVELLE® may cause serious side effects, including:**

- **serious allergic reactions**. Symptoms of allergic reactions include:
    - rash
    - swelling or your face and throat
    - rapid swelling all over your body
    - trouble breathing

    If you have a serious allergic reaction, stop using BRAVELLE® and call your healthcare provider or go to the nearest hospital emergency room right away.

- **ovaries that are too large.** BRAVELLE® may cause your ovaries to be abnormally large. Symptoms of large ovaries include bloating or pain in your lower stomach (pelvic) area. If your ovaries become too large your healthcare provider may tell you that you should not have intercourse (sex) so you do not rupture an ovarian cyst.
- **ovarian hyperstimulation syndrome (OHSS).** Using BRAVELLE® may cause OHSS. OHSS is a serious medical condition that can happen when your ovaries produce too many eggs (overstimulated). OHSS can cause fluid to suddenly build up in the area of your stomach, chest, and heart, and cause blood clots to form. OHSS may also happen after you stop using BRAVELLE®. Stop using BRAVELLE® and call your healthcare provider or go to the nearest hospital emergency room right away if you have any of the following symptoms of OHSS:
    - severe pelvic or stomach pain
    - nausea
    - vomiting
    - sudden weight gain
    - swollen stomach
    - diarrhea
    - trouble breathing
    - decreased or no urine

- **lung problems.** BRAVELLE® may cause serious lung problems that can sometimes lead to death including fluid in the lungs, trouble breathing, and worsening of asthma.

- **blood clots.** BRAVELLE® may increase your chance of having blood clots in your blood vessels. Blood clots can cause:

  o blood vessel problems (thrombophlebitis)

  o stroke

  o loss of your arm or leg

  o blood clot in your lung (pulmonary embolus)

- **twisted (torsion) of your ovaries.** BRAVELLE® may increase the chance of your ovary twisting, if you already have certain conditions such as OHSS, pregnancy and previous abdominal surgery. Twisting of your ovary may lead to blood flow being cut off to your ovary.

- **pregnancy with and birth of multiple babies.** BRAVELLE® may increase your chance of having a pregnancy with more than 1 baby. Having a pregnancy and giving birth to more than 1 baby at a time increases the health risk for you and your babies. Your healthcare provider should talk to you about your chances of multiple births before you start using BRAVELLE®.

- **birth defects in your unborn baby.** Babies born after ART may have an increased chance of birth defects. Your age, certain sperm problems, your genetic background and that of your partner, and a pregnancy with more than 1 baby at a time may increase the chance that your baby may have birth defects.

- **ectopic pregnancy (pregnancy outside your womb).** BRAVELLE® may increase your chance of having a pregnancy that is abnormally outside of your womb. Your chance of having a pregnancy outside of your womb is increased if you also have fallopian tube problems.

- **miscarriage.** Your chance of loss of an early pregnancy may be increased if you had difficulty becoming pregnant.

- **tumors of the ovary.** If you have used medicines like BRAVELLE® more than 1 time to get pregnant, you may have an increased chance of having tumors in your ovaries, including cancer.

The most common side effects of BRAVELLE® include:

- stomach cramps
- stomach fullness and bloating
- headache
- nausea
- pain
- pelvic pain
- hot flashes
- trouble breathing
- pain after egg removal (retrieval)

These are not all the possible side effects of BRAVELLE®. For more information, ask your healthcare provider or pharmacist.

Tell your healthcare provider if you have any side effect that bothers you or that does not go away.

**How should I store BRAVELLE®?**

- Before mixing, store BRAVELLE® powder in the refrigerator or at room temperature between 37℉ to 77℉ (3℃ to 25℃).

- Protect BRAVELLE® from light.
- BRAVELLE® should be used right after mixing.
- Throw away any unused BRAVELLE®.

**Keep BRAVELLE® and all medicines out of the reach of children.**

**General information about the safe and effective use of BRAVELLE®.**

Medicines are sometimes prescribed for purposes other than those listed in a Patient Information leaflet. Do not use BRAVELLE® for a condition for which it was not prescribed. Do not give BRAVELLE® to other people, even if they have the same condition you have. It may harm them.

This Patient Information summarizes the most important information about BRAVELLE®. If you would like more information, talk with your healthcare provider. You can ask your healthcare provider or pharmacist for information about BRAVELLE® that is written for health professionals.

For more information go to www.bravelle.com, or call **1-888-FERRING (1-888-337-7464)**.

**What are the ingredients in BRAVELLE®?**

Active ingredient: urofollitropin
Inactive ingredients: lactose monohydrate, polysorbate, sodium phosphate dibasic, heptahydrate and phosphoric acid

**Instructions for Use**

**BRAVELLE®** (brä-vel)

(urofollitropin for injection, purified)
for subcutaneous use

Your healthcare provider should show you how to mix and inject **BRAVELLE® or BRAVELLE® mixed with MENOPUR®** before you do it for the first time. Before using BRAVELLE® or BRAVELLE® mixed with MENOPUR® for the first time, read this **Instructions for Use** carefully. Keep this leaflet in a safe place and read it when you have questions.

**Supplies you will need to give your injection of BRAVELLE® or BRAVELLE® mixed with MENOPUR®. See Figure A.**

- a clean, flat surface to work on, like a table
- vials of BRAVELLE® powder (and MENOPUR® powder if you are going to mix the 2 medicines)
- vials of 0.9% Sodium Chloride, USP used for mixing the medicine
- alcohol pads
- rubbing alcohol
- gauze pads
- a sterile syringe and needle. Your healthcare provider should tell you which syringe and needle to use.
- the Q•Cap® that comes with your medicine
- a sharps disposal container for throwing away your used needles and syringes. See "**Disposing of your used needles and syringes**" at the end of these instructions.



**Figure A**

**Step 1. Preparing your BRAVELLE® or BRAVELLE® mixed with MENOPUR®.**

- Wash your hands well with soap and water. Dry your hands with a clean towel.
- Place all the supplies you need on the clean surface you already prepared.
- Open the Q•Cap® by peeling back the label. **See Figure B.**



**Figure B**

- Set aside the blister pouch with the Q•Cap®. Do not take the Q•Cap® out of the pouch at this time. Do not touch the ends of the Q•Cap®.

- Remove the plastic caps from the vials of BRAVELLE® (and MENOPUR® if needed) and 0.9% Sodium Chloride, USP. **See Figure C**.



**Figure C**

- Check the vial of BRAVELLE® (and MENOPUR® if needed) to make sure there is powder or a pellet in the vial. Check the 0.9% Sodium Chloride, USP vial to make sure that there are no particles in the liquid and the liquid in the vial is clear. If you do not see powder or see particles or the liquid is discolored, do not use the vial and call your pharmacist or healthcare provider.

- Wipe the tops of the vials with alcohol and allow them to dry. Do not touch the tops of the vials after you have wiped them. **See Figure D.**



**Figure D**

- Place the vial of 0.9% Sodium Chloride, USP on the table. Remove the Q•Cap® from the blister pouch by grasping the sides with your fingers. **See Figure E.** Carefully twist the syringe onto the connector end (luer) of the Q•Cap® until you feel a

slight resistance. Do not touch the spike at the end of the Q•Cap®. **See Figure E.**



**Figure E**

- Pull down on the syringe plunger until you have withdrawn the amount of 0.9% Sodium Chloride, USP from the vial that your healthcare provider told you to use.
  - The usual amount of 0.9% Sodium Chloride, USP used to mix your BRAVELLE® is 1 mL, but you should use the amount that your healthcare provider tells you to use. **See Figure F.**



**Figure F**

- Hold the syringe and place the spike end of the Q•Cap® over the top of the 0.9% Sodium Chloride, USP vial. Push the tip of the Q•Cap® into the rubber stopper of the vial until it stops. Be careful not to push down on the syringe plunger during this step. **See Figure G.**



**Figure G**

- Slowly push on the syringe plunger down to move the air from the syringe into the vial. Keeping the syringe and Q•Cap® together, turn the vial upside down and pull down on the syringe plunger to withdraw the right amount of 0.9% Sodium Chloride, USP from the vial. Your healthcare provider should tell you the right amount of 0.9% Sodium Chloride, USP to use. **See Figure H.**



**Figure H**

- Place the 0.9% Sodium Chloride, USP vial on the table. Remove the Q•Cap® and syringe from the vial by pulling up on the syringe barrel. Throw away the 0.9% Sodium Chloride, USP vial in your household trash. **See Figure I.**



**Figure I**

- Hold the vial of BRAVELLE® powder in 1 hand. Hold the sides of the syringe with your other hand and place the tip of the Q•Cap® over the top of the vial. Push the tip of the Q•Cap® into the rubber stopper of the vial until it stops. Be very careful not to push down on the syringe plunger during this step. **See Figure J.**



**Figure J**

- Slowly push down on the syringe plunger to push the 0.9% Sodium Chloride, USP into the vial with the BRAVELLE® powder in it. Gently swirl the vial until the BRAVELLE® powder is completely dissolved. **Do not shake** the vial as this will cause bubbles. **See Figure K.**



**Figure K**

- As soon as the powdered medicine has completely dissolved, turn the vial upside down and pull down on the plunger to withdraw all of the BRAVELLE® into the syringe. **See Figure L.**



**Figure L**

**If your healthcare provider tells you to use more than 1 vial of BRAVELLE® or tells you to mix your BRAVELLE® with MENOPUR® in the same syringe:**

- Mix your first vial of BRAVELLE® powder or MENOPUR® powder with 0.9% Sodium Chloride, USP. **Do not** inject your dose yet.

- Use the liquid in the syringe you have just mixed to mix the next vial of BRAVELLE® or MENOPUR®. **See Figure J through Figure L.**

- You can use the liquid in the syringe to mix up to 5 more vials of medicine.

- Your healthcare provider will tell you how many vials of BRAVELLE® and MENOPUR® to use.

**Step 2. Removing the Q•Cap® and adding your needle for injection.**

- When you have finished mixing the last vial needed for your injection and have withdrawn all the medicine into the syringe, remove the syringe from the Q•Cap®.

- Twist the syringe counter-clockwise while holding the Q•Cap® steady. Carefully remove the syringe from the Q•Cap®. **See Figure M.** Throw away the Q•Cap® with the attached medicine vial into your household trash. Carefully set the syringe with the medicine down on the table, being careful not to touch the tip of the syringe.



**Figure M**

• You are now ready to attach the needle to the syringe for your injection.

> **Your healthcare provider will tell you what needle you should use for your injection.**

• While holding the syringe tip pointing up, place the needle on top of the syringe. Gently push down on the needle and twist the needle onto the syringe in a clockwise direction until it is tight. **See Figure N.**



**Figure N**

• Hold the syringe with the needle pointing straight up. Pull down slightly on the plunger and tap the barrel of the syringe so that any air bubbles rise to the top. Slowly press the plunger until all the air is out of the syringe and a small drop of liquid is seen at the tip of the needle. **See Figure O.**



**Figure O**

• Tap the syringe to remove the small drop of liquid at the tip of the needle. **See Figure P.**



**Figure P**

• Carefully set the syringe with needle down on the table. **Do not** let the needle touch anything to keep it sterile. The medicine is now ready for you to inject. **See Figure Q.**



**Figure Q**

**Step 3. Injecting BRAVELLE® or BRAVELLE® mixed with MENOPUR®.**

• Select a site to inject BRAVELLE® or BRAVELLE® mixed with MENOPUR® on your stomach area (abdomen).

 o Pick a site on your lower abdomen, 1-2 inches below the navel, alternating between left and right sides.

 o Each day, inject in a different site to help reduce soreness and skin problems. For example, on day 1, inject yourself on the right side of your abdomen. The next day, inject yourself on the left side of your abdomen. Changing your injection sites every day will help reduce soreness and skin problems. **See Figure R.**



**Figure R**

• Clean your injection site with an alcohol pad. Let the alcohol dry. **See Figure S.**



**Figure S**

• Carefully remove the needle cap from the syringe. **See Figure T.**



**Figure T**

• Hold the syringe in 1 hand. Use your other hand to gently hold a fold of skin where you will insert your needle. Hold the skin between your thumb and index finger. **See Figure U.**



**Figure U**

• Hold your syringe at a right angle to your skin, like a dart. Quickly insert the needle all the way into your skin fold. **See Figure V.**



**Figure V**

• Push the plunger of the syringe with a steady motion. Keep pushing until all the fluid is injected into your skin. **See Figure W.**



**Figure W**

• Let go of your skin fold and pull the needle straight out of your skin. **See Figure X.**



**Figure X**

**Step 4. After your injection.**

• If there is any bleeding at your injection site, place a gauze pad over your injection site. Apply gentle pressure to stop the bleeding. Do not rub the site. **See Figure Y.**



**Figure Y**

• If your injection site becomes sore or red, you may put ice on your injection site for 1 minute and then take it off for 3 minutes. If needed, you may repeat this 3 or 4 times.

**Step 5. Disposing of your used needles and syringes.**

• Put your used needles and syringes in a FDA-cleared sharps disposal container right away after use. **Do not throw away (dispose of) loose needles and syringes in your household trash.**

• If you do not have a FDA-cleared sharps disposal container, you may use a household container that is:
  o made of a heavy-duty plastic,
  o can be closed with a tight-fitting, puncture-resistant lid, without sharps being able to come out,
  o upright and stable during use,
  o leak-resistant, and
  o properly labeled to warn of hazardous waste inside the container.

- When your sharps disposal container is almost full, you will need to follow your community guidelines for the right way to dispose of your sharps disposal container.  There may be state or local laws about how you should throw away used needles and syringes.  For more information about safe sharps disposal, and for specific information about sharps disposal in the state that you live in, go to the FDA's website at: http://www.fda.gov/safesharpsdisposal.

  Do not dispose of your used sharps disposal container in your household trash unless your community guidelines permit this. Do not recycle your used sharps disposal container.

This Patient Information and Instructions for Use has been approved by the U.S. Food and Drug Administration.

**MANUFACTURED FOR:**



FERRING PHARMACEUTICALS INC.
PARSIPPANY, NJ 07054

6317-06
Revised 02/2014